MCI TELECOMMUNICATIONS CORP., Plaintiff,

v.

OHIO BELL TELEPHONE COMPANY, et al., Defendants.

No. 97–CV–721.

United States District Court, S.D. Ohio, Eastern Division.

March 21, 2003.

Daniel J. Weiss, Judith Brick Sanders, Bell, Royer & Sanders, Columbus, OH, for Plaintiffs/Counter Defendants.

Alvin James McKenna, Porter, Wright, Morris & Arthur, Columbus, OH, for Defendant/Counter Claimant/Cross Claimant.

Duane W. Luckey, Jodi J. Bair, Steven T. Nourse, Ohio Attorney General, Public Utilities Commission, Columbus, OH, for Defendants/Cross Defendants.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for a merits review of the claims brought by the Ohio Bell Telephone Company, dba Ameritech Ohio ("Ameritech") and the counterclaim of the Defendant MCI Telecommunications Corporation ("MCI") under the Telecommunications Act of 1996, 47 U.S.C. §§ 151 *et seq* ("The Act"). Prior to the oral argument conducted in this case on March 6, 2003, MCI dismissed Count One of its Complaint, while Ameritech dismissed all of its counterclaims, other than Count Two.

As to the remaining claims, MCI contends that the Commissioners of the Public Utilities Commission of Ohio [1] ("Commissioners") violated the Act by ordering the inclusion of a limitation of liability provision in the Interconnection Agreement between MCI and Ameritech. In turn, Ameritech contends in its second counterclaim that the Commissioners unlawfully required Ameritech to compensate MCI at the tandem-served rate for terminating local traffic.

Both issues have been fully briefed by the parties and are ripe for final determination.

## I.

In a prior Order in this case, this Court discussed the history of the 1996 Telecommunications Act and the procedure required when an incumbent local exchange carrier, such as Ameritech, cannot reach agreement with a competitor, such as MCI, regarding access to networks, facilities and services in order to provide competitive local telephone exchange service. (*Opinion and Order,* March 31, 2000). Essentially, the Act establishes a procedure which first involves negotiations between the incumbent carrier and the new competitor. In the event the parties fail to negotiate terms regarding an interconnection agreement, the Act authorizes state public utility commissions to adjudicate or arbitrate disputed issues. In such case, either the new entrant or the incumbent carrier may file a petition for arbitration under 47 U.S.C. § 252(b)(1).

The Act provides that a party petitioning a state commission must provide relevant documentation concerning unresolved issues. Thereafter, under § 252(b)(4)(A), the state commission "shall limit its consid-eration of any petition ... to the issues set forth in the petition and in the response."

Essentially, MCI complains that the Commissioners addressed and resolved a dispute between MCI and Ameritech which had not been listed in the petition of MCI or the response of Ameritech as a disputed issue subject to arbitration. While this may be technically correct, the procedural posture of the case is somewhat more complex.

It is undisputed that on August 27, 1996, MCI filed a petition requesting compulsory arbitration of unresolved issues. The petition did not reference or seek arbitration of provisions proposed by Ameritech during the negotiation limiting Ameritech's liability to MCI for negligent acts or omissions to the greater of (1) the amount that Ameritech charged MCI for the service; or (2) the amount of liability Ameritech would have to its own customer for the alleged deficient service.

Thereafter, Ameritech filed a response to the petition of MCI and also identified issues which it intended to submit to arbitration. This response did not include as a contested issue the question of limits on liability. The Commission then directed the matter to arbitration which ultimately resulted in an Arbitration Award issued by the Commission resolving all of the matters submitted. In accordance with the Commission's directive contained in the Arbitration Award, both parties submitted a proposed interconnection agreement for approval.

On March 13, 1997, the Commission issued an Order and Opinion which included the limits of liability provisions described above as originally proposed by Ameritech, but rejected by MCI. Despite the fact that

---

1. By previous Order of this Court, the claims asserted by Ameritech and MCI may be brought only against the Commissioners of the Public Utilities Commission of Ohio based upon *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This action proceeds against the individual commissioners in their official capacities.

no agreement had been reached by negotiations prior to the demand for arbitration, neither Ameritech nor MCI requested the Commission to resolve the issue through the arbitration process. Neither party, however, agreed with the other's proposal on this issue.

MCI contends that the Commissioners may not, consistent with the Act, specifically § 252(b)(4)(A), resolve any issue not submitted by the parties as an issue to be resolved by the State Commission. MCI contends that under § 252(b), the Commissioners were without legal authority to compel terms of the interconnection agreement concerning matters that neither party submitted for binding resolution.

It is also undisputed, however, that MCI knew, prior to the arbitration proceedings, that it had not reached agreement with Ameritech as to the language in question. Notwithstanding such fact, neither MCI nor Ameritech submitted the matter to the Commissioners for resolution, prior to the Arbitration Award. Only after the arbitration proceedings had commenced did MCI attempt to submit, at the eleventh hour, proposed testimony related to limitations of liability. Ameritech moved to strike such testimony and the arbitration panel granted the motion.

Since the commencement of this case, the parties have entered into a new interconnection agreement which is now in full force and effect. The language of the agreement includes provisions relating to limitations of liability which the parties have consensually negotiated. The issue raised in Count Two of MCI's Complaint in this case applies only to inchoate claims. No claims have been brought, nor have any claims been threatened, which would implicate the disputed terms of the limits of liability imposed by the Commissioners in a now expired interconnection agreement. The parties do not dispute that there is at least a possibility that in the future claims could be filed and the rights and liabilities of the parties affected by the disputed terms.

The Commissioners now assert that the matter does not present a case or controversy sufficient to give rise to the Article III jurisdiction of this Court. Because the Agreement is expired, the Commissioners contend that they may no longer be properly before this Court under the *Ex Parte Young* exception to the Eleventh Amendment, insofar as no prospective relief is available. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

■ This Court agrees in part with the position taken by the Commissioners. Initially, the Court notes that *Ex Parte Young* relief might be available to the Plaintiff, notwithstanding the expiration of the Agreement, if portions of the Agreement continue to have prospective effect. If, for example, claims were currently pending in state court and the liability on such claims were effected by the terms of the now expired interconnection agreement, there is no question that a case or controversy would then exist.

In a truly abstract sense, the Plaintiffs correctly assert that a controversy exists in that the limitations of liability language adopted by the Commissioners has imposed a modification of the legal obligations of the parties to each other. If this were the only salient fact in the analysis of whether the issues are moot, the Court would be inclined to find for the Plaintiff. The Court must also consider, however, the fact that the parties have entered into a new agreement in which agreed language on limitations of liability has been adopted. Further, the Court must consider that no current claims are pending which are effected by the disputed provisions of the now expired interconnection agreement.

As the Court of Appeals for the Sixth Circuit recently held in *Cooley v. Granholm*, 291 F.3d 880, 881 (2002), courts should refrain from resolving issues which are either moot, not yet ripe, or both. In *Cooley*, physicians brought an action challenging the constitutionality of Michigan's anti-euthanasia statute. As the Court noted, however, the record before it did not describe any competent, terminally ill patient who might potentially request euthanasia and therefore be limited by the provisions of Michigan law. As the Court observed:

> The case is presently hypothetical and, as the Supreme Court observed in *Cruzan* [*v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)] about euthanasia, "it is the better part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject."

*Id.* at 882 (external citations omitted). Further, as noted by the Supreme Court in *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" (quoting *Thomas v. Union Carbide*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)).

Under the unique circumstances of this case, the Court finds that the claim raised by MCI in its Count Two is not ripe for adjudication and is most probably moot. The Court therefore declines to adjudicate the issue. The Court does note, however, that because it cannot be said with absolute certainty that the provisions at issue in Count Two of MCI's Complaint will not have some future effect as to claims which have accrued but are not yet filed, the dismissal of Count Two is without prejudice to refiling in the event an actual controversy involving the disputed provision of the interconnection agreement occurs.

## II.

In its second counterclaim, Ameritech contends that the Commissioners erred by requiring it to compensate MCI at the higher tandem-served rate for terminating local traffic. According to Ameritech, MCI's single switch only qualifies for what is called the lower end office rate.[2]

In explaining their decision, the Commissioners noted that "where a switch of a non-incumbent LEC serves a geographic area comparable to the area served by the incumbent LECs tandem switch, the appropriate rate for the non-incumbent LEC is the incumbent LEC's tandem interconnect rate." (Arbitration Award at 18). In other words, if the switch of the new entrant, MCI, serves a geographic area comparable to the tandem switch served by the incumbent LEC—Ameritech—then the rates ordered for transporting each other's traffic is symmetrical.

The Commission's guidelines applicable to this dispute are based upon the FCC rule found at 47 CFR § 51.711(a)(3) which provides[3]:

> Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incum-

---

**2.** Initially, Ameritech contended that MCI had to establish that its switch served a comparable geographic area to that served by Ameritech and that its switch performs functions similar to the incumbent's tandem switch.

Ameritech has since abandoned the functionality argument.

**3.** The PUCO applied § IV.D.5 of its Local Service Guidelines which is based upon the FCC rule found at 47 CFR § 51.711(a)(3).

bent LEC's tandem interconnection rate.

The PUCO found that MCI's switch in question was comparable to Ameritech in that it served a comparable geographic area. This area, which basically includes Cuyahoga County and Cleveland, Ohio, was designated by the PUCO as a geographic region which MCI was legally authorized to serve. Ameritech essentially contends that the PUCO ordered a symmetrical rate based on the assumption that MCI could, rather than actually did, serve a comparable geographic area.

Both the Commissioners and MCI contend that the decision of the PUCO is entirely consistent with federal law, specifically 47 CFR § 51.711(a). Further, in accordance with the purposes of the Act, the Commissioners are to encourage innovation and deployment of newer, more advanced technologies. If Ameritech's argument is credited, according to MCI and the Commissioners, a new entrant would be dissuaded from entering the market, if such company had to first develop and serve an entire customer base, rather than simply developing the capacity to serve such base, before symmetrical pricing would occur. Significantly, the Commission expressly invited the parties to provide ongoing information if the circumstances relative to the tandem switch changed. (See Arbitration Award at 18). Neither party sought any additional relief from the Commission after the Order subject to this appeal was issued.

## III.

 It is now well-established that this Court reviews the decisions of the Commissioners of the PUCO *de novo* as to whether or not the arbitrated interconnection agreements are in compliance with the Act, while all other issues, particularly factual determinations, are reviewed under an arbitrary and capricious standard. *Michi-*

*gan Bell Telephone Co. v. MCIMetro Access Trans. Serv., Inc.,* 323 F.3d 348 (6th Cir. March 10, 2003); *U.S. West v. Washington Utilities & Trans. Comm.,* 255 F.3d 990 (9th Cir.2001); *MCI Telecommunications Corp. v. Michigan Bell Telephone Co.,* 79 F.Supp.2d 768 (E.D.Mich.1999). The parties do not dispute that the issue in this case is resolved by the regulation found at 47 CFR § 51.711(a). Instead, the parties dispute the conclusions reached by the Commissioners in applying such regulation to the specific factual circumstances. Consequently, this Court reviews the decision of the Commissioners under the arbitrary and capricious standard.

 The regulations promulgated by the FCC state that "[r]ates for transportation and termination of local telecommunications traffic shall be symmetrical ..." 47 CFR § 51.711(a). At the same time, § 51.711(a)(1) further notes that "symmetrical rates are rates ... for the same services." Further, as noted above, § 51.711(a)(3) states, "[w]here the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate."

Ameritech contends that the Commissioners improperly assumed that MCI was serving an area comparable to that served by Ameritech's tandem switch. Specifically, Ameritech looks to the following portion of the Arbitration Award which states:

We turn our attention to MCI's conditional certificate approved in Case No. 94–2012–TP–ACE, wherein the Commission granted MCI authority to provide local telecommunications services in Cuyahoga, Franklin, and Montgomery Counties. We shall presume, given the startup nature of MCI's operations, that

MCI shall serve the area for which we found it worthy of a certificate. In our view, that is the comparable service area. MCI's request that Ameritech pay MCI the Tandem Office Interconnection Rate for transport and termination of calls on MCI's network is granted.

(Arbitration Award at 18). The Commissioners went on to note:

We have reached this conclusion on the basis of the information in this proceeding. We are deciding the issue on the best information we have. We expect the parties to provide regular reports to the Commission's telecommunications staff so that we may receive ongoing information.

*Id.* No additional evidence has been presented to the Commission following the bodies for subsequent review in light of new circumstances.

Several other courts have addressed the issue raised by Ameritech. In *MCI Telecommunications Corp. v. Michigan Bell Telephone Co.,* 79 F.Supp.2d 768, 789 (E.D.Mich.1999), Judge Edmunds found that the Michigan Public Service Commission correctly determined that MCI had not shown that its switch served a geographic area comparable to the area served by Ameritech's tandem switch. Importantly, she noted, "MCI currently does not have the authority to serve every exchange in the Detroit local access and transport area ("LATA")." *Id.* While the opinion does note that 47 CFR § 51.711(a)(3) requires the competing carrier switch to actually serve a comparable geographic area, the facts in the *Michigan Bell Telephone Co.* case involved a new entrant which had not obtained state authority to serve the area which it claimed to be comparable. In this case, MCI had been previously determined by the PUCO to be able to provide local telecommunications service in the comparable geographic area in question.

In *MCI Worldcom Communications, Inc. v. Pacific Bell Telephone Co.,* No. C–00–2171 VRW, 2002 WL 449662 (N.D.Ca. March 15, 2002), the Court found that the Public Utilities Commission of the State of California improperly assumed that the similarity of the comparable areas would, in the future, be eliminated once Worldcom's new switches were in place. The Court criticized the Commission's untested future assumptions which it used to negate the presumption of symmetrical rates clearly imbedded in 47 CFR § 51.711. While the Court did invalidate a decision based upon future assumptions, those assumptions were used by the State Commission to prevent symmetric rates in an otherwise comparable geographic area, as required by federal law.

In *Indiana Bell Telephone Co. v. McCarty,* No. IP 01–1690 CMS, 2002 WL 31803448 (S.D.Ind. Dec. 13, 2002), the Court affirmed the decision of the Indiana Utility Regulatory Commission which found that AT & T was serving a comparable geographic area served by the LEC's tandum switch. Because AT & T was already serving customers in the location in question, the Court concluded that the Commission did not have to speculate about future events. The district court concluded that the Commission's determination was neither arbitrary nor capricious.

In the Court's view, 47 CFR § 51.711(a), begins with the requirement that rates for transportation and termination of calls between incumbent carriers and competing carriers should be presumptively symmetrical. Section 51.711(a)(3) further explains that the costs between the two carriers shall be deemed to be identical if the switches involved serve a comparable geographic area.

While the regulations do not define those circumstances in which a competing carrier "serves a comparable geographic area," the Court again refers to the deference owed to the Commissioners under the arbitrary and capricious standard. In this case, the Commissioners relied upon the fact that the PUCO had previously found MCI able to serve the area in question and had granted the company an operating certificate. Further, the PUCO expressly permitted and encouraged any party to submit additional data available in the future which could call into question its conclusions that MCI would serve the areas in question.

The Commissioners argue that, given the time constraints set forth in 47 U.S.C. § 252(e)(4) requiring that arbitration be completed within ninety days, that they could conclude, subject to later modification, that MCI would serve the area for which it sought and obtained certification. In addition, there is evidence of record to support the conclusion reached by the Commissioners on a factual basis as well. MCI's manager of network engineering testified that MCI's switch in the Cleveland area was already in place. (Marzullo, O. Testimony Tr. III at 318–19.).

This Court concludes that the Commissioners were neither arbitrary nor capricious in finding that MCI had the capacity to serve a region in northeastern Ohio for which it had applied and obtained a Certificate of Operation. The Commissioners correctly applied federal law which presumes that symmetrical rates will be assessed. Unlike the facts in *MCI Telecommunications v. Michigan Bell Telephone Co., supra,* the competing local exchange carrier in this case had already obtained state authorization to provide telephone service in the comparable area at issue under § 51.711(a)(3).

▉ Finally, this Court is most reluctant to consider at least a portion of Amer-

itech's claims which, if true, could have been presented to the Commissioners, after the PUCO invited the parties to resubmit additional information bearing on this issue. Under the provisions set forth in the Act for judicial review, it is most inappropriate for a district court to review matters which have not been fully presented to the Commissioners.

## IV.

Based upon the foregoing, this Court concludes that the issues raised in Count II of the Complaint are not sufficiently ripe for judicial review and the claim is **DISMISSED without prejudice** to refiling in the event an actual dispute later arises. The Court further concludes with regard to Ameritech's Counterclaim that the Commissioners were neither arbitrary nor capricious in deciding to impose tandem rates and otherwise acted in accordance with federal law. This case is therefore **DISMISSED** pursuant to this Order.

**IT IS SO ORDERED.**